**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MARK M. NORTH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-cv-378-CVE-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,[1]** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Mark M. North seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. <u>See</u> <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. <u>See</u> <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a fifty-seven year old male, applied for Title II benefits on April 14, 2009, alleging a disability onset date of August 30, 2005. (R. 153-54). Plaintiff alleged that he was unable to work due to "Depression, Post Traumatic Stress Disorder, High Blood Pressure, Acute Anxiety Attacks, Asthma, Diabetes." (R. 167). Plaintiff's claims for benefits were denied initially on June 20, 2009, and on reconsideration on December 10, 2009. (R. 76, 77, 78-72, 84-86). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held an initial hearing on August 12, 2010, and a supplemental hearing on February 15, 2011. (R. 32-62, 63-75). The ALJ issued a decision on March 18, 2011, denying benefits and finding plaintiff not disabled. (R. 10-31). The Appeals Council denied review, and plaintiff appealed. (R. 1-9; Dkt. # 2).

On appeal, plaintiff raises three points of error. (Dkt. # 19). First, plaintiff argues that the ALJ erred at step five by including transferable skills and by failing to include mental limitations in his hypothetical to the vocational expert. <u>Id.</u> Second, plaintiff argues that those errors extended to the ALJ's findings regarding plaintiff's ability to perform other work. <u>Id.</u> Finally, plaintiff contends that the ALJ failed to properly assess plaintiff's credibility. <u>Id.</u>

## <u>The ALJ's Decision</u>

The ALJ found that plaintiff, who was insured through December 31, 2010, had not engaged in any substantial gainful activity since August 30, 2005, his alleged disability onset

date. (R. 15). The ALJ found that plaintiff had severe impairments of asthma, obesity, panic disorder, and post-traumatic stress disorder. Id. Plaintiff had non-severe, medically determinable impairments of hypertension, diabetes mellitus, hearing loss, and depressive disorder NOS. (R. 16). Plaintiff's impairments did not meet or medically equal a listing. (R. 16-17). The ALJ specifically considered Listing 3.00 (Respiratory System) and Listing 12.06 (Anxiety Related Disorders) and the effects of plaintiff's obesity. Id. The ALJ also reviewed the "paragraph B" criteria in assessing plaintiff's mental impairments. (R. 17-18). The ALJ found that plaintiff had mild restrictions in activities of daily living, moderate restrictions in the areas of social functioning and concentration, persistence, and pace, and no episodes of decompensation. Id.

The ALJ then examined the medical records and hearing testimony to determine plaintiff's residual functional capacity. (R. 19-26). Plaintiff testified that he had retired from his job at the Department of Human Services in 2005 "due to stress, anxiety and panic attacks." (R. 19). In August 2005, plaintiff's supervisor implemented new productivity guidelines that cut plaintiff's time allocated for paperwork by twenty-five to thirty percent. Id. Plaintiff's supervisor also advised plaintiff that he was not meeting deadlines and accuracy rates. Id. Plaintiff stated that he had panic attacks two or three times a month and needed six to seven hours to recover, thereby preventing him from working. Id. The attacks were triggered by "[s]ituations involving two to three tasks at a time." Id. These events led plaintiff to retire. Id.

Plaintiff has applied for other jobs since his retirement. Id. In May 2010, the Census Bureau hired plaintiff, but plaintiff had a panic attack as he was leaving home to attend orientation, and he never performed any work for the Census Bureau. Id. Plaintiff described his difficulties in a function report, where he discussed the lack of patience and stamina that led to his retirement. (R. 20). Plaintiff worked extra hours "to remain half-way caught up," and was

still unable to maintain his workload. (R. 20). Plaintiff also stated that his psychiatrist had opined that plaintiff's "depression and post-traumatic stress disorder conditions would have made any progress in job performance virtually impossible." Id.

The medical records showed a history of treatment for panic beginning in September 2003. (R. 21). Plaintiff began taking medication, and within six weeks, plaintiff reported that he felt ready to return to work. Id. Plaintiff's social worker noted that plaintiff had responded well to medication and was able to utilize "interventions and techniques suggested in therapy." Id.

After 2003, plaintiff did not seek treatment until October 2005. Id. At that time, plaintiff was diagnosed with panic disorder and post-traumatic stress disorder. Id. His GAF score, 50, "indicat[ed] the presence of serious symptoms." Id. Again, plaintiff responded quickly. Id. Within one month, his symptoms were well controlled, and his GAF score improved to 60-70, "indicating the presence of only moderate to some mild symptoms." Id. By March 2006, plaintiff showed no symptoms. Id. By March 2007, plaintiff's psychiatrist declared plaintiff to be "in remission," but plaintiff continued to receive medication management. Id. Plaintiff "took Zoloft and Elavil to control his symptoms." Id.

The ALJ found that plaintiff's panic attacks were "situational." Id. At his November 2007 appointment, plaintiff reported a panic attack related to job applications. Id. The treating psychiatrist confirmed plaintiff's diagnoses of panic disorder and post-traumatic stress disorder, but he rated plaintiff's GAF score at 95-100. Id. Plaintiff reported another situational panic attack related to his job-hunting activities in February 2008, although his mood, sleep, concentration level, and anxiety level were good. Id. In October 2008, plaintiff was no longer having panic attacks and was only experiencing anxiety when interviewing for a job. Id. Plaintiff was able to apply for jobs without panic attacks by February 2009. Id.

Plaintiff began seeing a new treating psychiatrist in October 2009. (R. 21). Plaintiff reported "that his anxiety level was better" and that his medications were "quite helpful." Id. Plaintiff stated that he "had intermittent panic attacks, usually triggered by specific situations, such as interviews for a part-time job or issues related to the settlement of his late mother's estate." Id. Plaintiff's new psychiatrist diagnosed plaintiff with "panic disorder, without agoraphobia, and prior diagnosis of post-traumatic stress disorder." (R. 22). He opined that plaintiff was exhibiting moderate symptoms, as evidenced by a GAF score of 60. Id.

Plaintiff also underwent a psychological consultative examination in October 2009. Id. Plaintiff complained of having poor concentration, feeling "very overwhelmed," having periodic depression, and experiencing two to three panic attacks a month. Id. Despite these complaints, plaintiff "demonstrated good abilities" during the mental status examination. The consultative examining psychologist diagnosed plaintiff with "generalized anxiety disorder, panic disorder without agoraphobia, and depressive disorder, not otherwise specified." Id.

In January 2010, plaintiff's treating psychiatrist completed a mental medical source statement form. (R. 24). He opined that plaintiff had moderate limitations in a number of areas, including the ability to remember, understand, and carry out simply instructions, maintain attention and concentration for extended periods of time, maintain regular attendance or work within a schedule, interact with the general public, and get along with co-workers. Id. Plaintiff also had marked limitations in a number of areas, including his "ability to complete a normal workday and workweek," perform work at a consistent pace, "accept instructions and respond appropriately to criticism," and "travel in unfamiliar places or use public transportation." Id.

In July 2010, plaintiff complained of "the worst anxiety attack he had ever experienced" related to his application to work for the Census Bureau. (R. 22). At that same appointment,

plaintiff's psychiatrist noted that plaintiff had taken on more responsibility at home. (R. 22). Plaintiff also had taken an extension course through OSU and was taking a class on international current affairs through his church. Id. The psychiatrist found that plaintiff had improved and that his mood was "at baseline." Id. Based on these records, the ALJ found that plaintiff had "engaged with success in activities that may cause stress or anxiety" without experiencing any triggers Id.

The ALJ did not give controlling weight to the treating psychiatrist's mental medical source statement form, finding that "it is inconsistent with the other medical and non-medical evidence in the case." (R. 25). The ALJ noted that the psychiatrist only saw plaintiff every few months for "outpatient medication management and brief psychotherapy during medication management." Id. The psychiatrist's notes showed plaintiff performing a wide range of activities without negative impact on his mood. Id. Additionally, the records demonstrated that plaintiff's medications were "helpful." The ALJ criticized the psychiatrist's failure to cite any "objective medical findings to explain the summary conclusions." Id. The ALJ concluded that the psychiatrist's opinion in the mental medical source statement should be given "little weight." Id.

The ALJ also disagreed with the agency doctor's opinions, which concluded that plaintiff's mental impairments were non-severe. Id. The ALJ cited the objective medical evidence, plaintiff's "credible testimony" at the hearing, and "[a] different interpretation of the earlier records" as his reasons for finding that plaintiff's limitations were more severe than those cited by the agency doctors. Id.

Finally, the ALJ found that plaintiff's complaints were not entirely credible. (R. 23). He focused on plaintiff's extensive activities of daily living, which included not only driving, running errands, and managing household chores, but also playing basketball at a local park and

taking classes through OSU and his church. (R. 23). Plaintiff also expressed his interest in travel. Id. The ALJ noted plaintiff's history of treatment for panic disorder dating back to 2003, but he concluded that plaintiff responded well to treatment, "significantly" improving "his mood and quality of life." Id. However, plaintiff's long, stable work history boosted his credibility. (R. 25).

The ALJ also acknowledged plaintiff's history of panic attacks, "some triggered by employment," but found that plaintiff had been "able to engage in activities that involve stress." (R. 23). He also cited plaintiff's improvement through the use of medication and therapy. Id. The ALJ did agree to set limits based on plaintiff's complaints about his lack of "patience and stamina" and his increased irritation when dealing with the public in his previous job as a social worker. Id.

Taking all of this evidence into consideration, the ALJ concluded that plaintiff retained the residual functional capacity to perform medium work "except that he must avoid concentrated exposure to fumes, odors, dusts, toxins, gases, and poor ventilation. The claimant is limited to superficial contact with coworkers and supervisors, and no contact with the public." (R. 19). Although the plaintiff was unable to perform his past relevant work as a social worker (skilled work at the sedentary level), plaintiff's transferable work skills in data entry and office procedures, combined with his residual functional capacity, would permit him to perform other work. (R. 26). Relying on the vocational expert's testimony, the ALJ found that plaintiff could perform other work as a data entry clerk or filing clerk. (R. 27). Accordingly, the ALJ found that plaintiff was not disabled. Id.

**The ALJ Hearings**

The ALJ conducted two hearings on plaintiff's application. At the first hearing, held on August 12, 2010, the ALJ elicited testimony from plaintiff. (R. 32-62). When the ALJ realized

that he did not have fully updated medical records (R. 57-60), he continued the hearing to allow for receipt and review of the records before taking testimony from a vocational expert. (R. 63-75).

Plaintiff testified that he retired from his job as a social worker due to stress, anxiety and panic attacks, which occurred two to three times per month. (R. 44). Plaintiff testified that, although he retired in December 2005, the panic attacks began in February 2005. (R. 45). Multitasking triggered the attacks, and plaintiff described feeling as though he was drowning or trapped in a box. (R. 46). At the time, plaintiff was having difficulty maintaining acceptable levels of productivity and accuracy. (R. 47). However, when his employer reduced the amount of time he was able to spend on paperwork by twenty-five to thirty percent, plaintiff testified that the changes were the "proverbial straw." (R. 46).

Plaintiff also testified that he had previously taken FMLA leave in 2001 and 2003 for panic attacks. (R. 47-48). His worst panic attack was triggered by his attempt to begin work for the Census Bureau in May 2010. (R. 48). Plaintiff testified that recovering from that attack took six or seven hours. Id.

Employment issues, specifically the fear of having to focus on multiple tasks at one time, were plaintiff's only trigger for the panic attacks. (R. 49). Plaintiff testified that he could do chores at home without anxiety as long as he could focus on one chore at a time. Id. Plaintiff had also recently joined a church, handled the probate of his mother's estate, and applied for jobs. (R. 50-54).

Plaintiff admitted that he had no physical impairments that would prevent him from working. (R. 60).

At the second ALJ hearing on February 15, 2011, the ALJ took testimony from a vocational expert. (R. 63-75). The vocational expert testified that plaintiff's previous work as a social worker was skilled, sedentary work. (R. 70). As such, plaintiff had transferable work skills of data entry and office procedures, such as filing. (R. 71). The ALJ posed a hypothetical: medium work; avoidance of concentrated exposure to fumes, odors, dusts, toxins, gases, and poor ventilation; and avoidance of "intense interpersonal contacts with coworkers, supervisors, and the public." Id. The vocational expert testified that plaintiff could perform other work, such as a data entry clerk, file clerk, and telephone answerer. (R. 72-73). When the ALJ posed a second hypothetical with stricter limitations on contact – "superficial contact with the supervisors and coworkers and no public contact," the vocational expert limited those previous examples to the jobs of data entry clerk and file clerk. (R. 73). Finally, the vocational expert testified, in response to the ALJ's question, that plaintiff would not be able to work if he experienced panic attacks that impacted his work day "two or more days a month." Id.

**Plaintiff's Medical Records**

Because plaintiff admitted at the ALJ hearing that he had no physical impairments that would impact his ability to work and because plaintiff has not challenged the ALJ's findings regarding plaintiff's physical impairments, the review of plaintiff's medical records is limited to those records impacting plaintiff's mental health. (R. 60; Dkt. # 19).

Plaintiff's history of treatment for panic attacks and panic disorder dates back to March 2000. At that time, a doctor (whose signature is unintelligible) signed a form diagnosing plaintiff with "stress" and stating that he was "disabled" and unable to work "indefinitely." (R. 430). No other medical records from that time period are included in the administrative record. Plaintiff

also testified that he took FMLA leave in 2001 and 2003, but none of the medical records address any treatment that he received during those periods of time.

Plaintiff's first record of substantive treatment for anxiety and panic disorder is dated September 2003, after he had been on FMLA leave for some time. (R. 391). Plaintiff's psychiatrist recommended that plaintiff re-establish a medication regimen to address his anxiety. Id. Plaintiff improved quickly. By the end of October 2003, plaintiff was ready to return to work. (R. 388).

Plaintiff took FMLA leave again for stress and anxiety in August 2005, but he did not return to his psychiatrist for treatment until mid-September 2005. (R. 426-29). By November, plaintiff stated that his anxiety was "manageable," even though he was dealing with his impending retirement and the sale of his mother's house. (R. 419). Plaintiff continued to see his psychiatrist for medication management, and showed signs of consistent improvement. (R. 392-418). Plaintiff's records demonstrate that, as long as he was not actively looking for work, he had no real anxiety. (R. 392-418). Plaintiff reported that he only felt anxious when interviewing for jobs. (R. 402).

Plaintiff stopped treatment in the spring of 2009 but began treatment with a new doctor, Dr. Matthew Meyer, in October 2009. (R. 458-61). Plaintiff reported that his anxiety was much improved but that he still had "intermittent panic attacks, usually triggered by specific situations," such as job interviews and his mother's estate. Id. In December 2009, plaintiff reported that he "[r]emains anxious and avoidant of situations that remind him of [his] former job, but mood is no worse." (R. 457). Plaintiff was able to do routine errands and eat out without becoming anxious. Id.

Dr. Meyer prepared a mental medical source statement in January 2010. (R. 462-66). He opined that plaintiff had moderate limitations in most areas. Id. He found that plaintiff had marked limitations in the areas of completing a normal workday/work week, accepting instruction and criticism from supervisors, responding to changes in the work setting, and traveling in unfamiliar places. Id. Dr. Meyer provided no explanation for these limitations. (R. 465-66).

By March 2010, plaintiff reported that he was handling more of the household work, taking a church class on international current affairs, and had recently completed an extension course at OSU. (R. 542). Still, plaintiff reported that he did not feel ready to return to work. Id. Plaintiff's next appointment was in July 2010. (R. 544). At that time, plaintiff reported that he had gotten a job with the Census Bureau; however, he experienced the most severe anxiety attack of his life the night before the job was to begin, so he never started the job. Id. Plaintiff stated that he had "made progress with most things, but can't do things that are employment related." Id. In March and in July, Dr. Meyer opined that plaintiff was only experiencing "relatively mild residual symptoms" and had improved his mood and quality of life "significantly. (R. 542, 545). Dr. Meyer also found that plaintiff's mood was "at baseline currently." Id.

In October 2010, plaintiff reported that he was doing well. (R. 552-53). Plaintiff was attending classes through his church and through OSU and found class discussions enjoyable. (R. 553). Plaintiff was able to drive without anxiety as long as he avoided rush hour traffic, and he shopped regularly without issue. Id. He still reported feeling anxious about working and was not currently looking for work. Id. In January 2011, plaintiff reported having an anxiety attack during a family trip to Ohio after becoming overwhelmed by "an unfamiliar place." Id. He stated

that he has no issues regarding activities within his routine, but he could not cope "with anything unfamiliar." (R. 553).

He saw Dr. Meyer again in April and July 2011 after the ALJ issued the decision denying benefits. Id. In July, plaintiff reported that he had given a class presentation to a small group without incident, but he felt overwhelmed when he had "too many things to do." Id. Dr. Meyer noted that plaintiff was avoidant when it came to the issue of employment. Id. Still, Dr. Meyer found that plaintiff was only experiencing "mild-moderate residual symptoms." Id.

At the same time plaintiff began seeing Dr. Meyer in October 2009, he had a consultative psychological examination with Dr. Stephanie Crall. (R. 482-85). Plaintiff reported his history of panic attacks and described his symptoms as "poor concentration, inability to 'emotionally handle things,' often feeling 'very overwhelmed,' and worrying about a number of events with an inability to control worrying." (R. 483). Plaintiff listed his current medications and stated that he had "participated in outpatient counseling" from October 2005 through February 2006. Id. Dr. Crall performed a mental status examination and diagnosed plaintiff with generalized anxiety disorder and panic disorder without agoraphobia. (R. 485).

Based on Dr. Crall's report, an agency physician completed a Psychiatric Review Technique form and determined that plaintiff had generalized anxiety disorder, which resulted in mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace. (R. 486-499). The physician noted that although plaintiff was on medication, he had not received treatment since 2006. (R. 498). The report also noted that the mental status examination indicated that plaintiff's concentration was good. Id.

## ANALYSIS

Plaintiff argues that the ALJ erred at step five by including transferable skills and by failing to include certain mental limitations in his hypothetical to the vocational expert. (Dkt. # 19). Second, plaintiff argues that the ALJ did not properly consider the medical opinion of plaintiff's treating psychiatrist, Dr. Meyer. Id. Finally, plaintiff contends that the ALJ failed to properly assess plaintiff's credibility. Id.

### Step Five

Plaintiff contends that the ALJ failed to adopt certain mental limitations in his hypothetical to the vocational expert. Id. Plaintiff also contends that the ALJ should have incorporated his findings regarding plaintiff's mental limitations at step two into his findings at steps four and five. Id. Finally, plaintiff argues that it was improper to include transferable skills in the hypothetical as a result of plaintiff's mental limitations. Id. The Commissioner argues that plaintiff is confusing the mental limitations found at step two with the residual functional capacity assessment at step four. (Dkt. # 20).

Plaintiff's argument is not a step five argument but a step four argument in which plaintiff essentially challenges the ALJ's residual functional capacity findings. This distinction is significant because a claimant bears the burden of proof at step four, while the Commissioner bears the burden of proof at step five. See Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).

The undersigned agrees with the Commissioner that plaintiff's reliance on the ALJ's step two findings is misplaced. Plaintiff argues that the ALJ should have addressed the moderate limitations on social functioning and concentration, persistence, or pace in the hypothetical. (Dkt. # 19). As SSR 96-8p establishes, and as the ALJ noted in his decision however, "the limitations

14

identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p; (R. 18). The ALJ was not required to include those specific findings from step two in his residual functional capacity assessment or, by extension, in his hypothetical to the vocational expert. See Anderson v. Colvin, 514 Fed.Appx. 756, 763 (10th Cir. 2013) (unpublished).[2]

Plaintiff's remaining arguments regarding transferable skills and mental limitations are best addressed in the context of the ALJ's evaluation of the medical source opinions.

**Medical Source Opinions**

The ALJ determined that plaintiff retained the ability to perform simple and complex tasks and transferable skills related to data entry and office procedures after giving some weight to the opinion of Dr. Crall, the consultative examining psychologist, and giving little weight to the opinion of Dr. Meyer, plaintiff's treating psychiatrist. Plaintiff argues that the ALJ erred in evaluating the treating physician's medical opinions because the ALJ did not cite specific evidence to justify his rejection of the treating physician's opinion. (Dkt. # 19). Plaintiff contends that, contrary to the ALJ's decision, the evidence in the record, including Dr. Meyer's own treating notes, does not contradict Dr. Meyer's opinion and that the ALJ improperly relied on plaintiff's testimony in giving little weight to that opinion.[3] Id.

The Commissioner argues that the ALJ is permitted to reject a treating physician's opinion when it contradicts the physician's own treatment notes. (Dkt. # 20). The Commissioner also argues that the ALJ properly considered the medical source opinion and cited to specific

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

[3] Plaintiff contends that the term "little weight" is synonymous with rejection. (Dkt. # 19).

reasons for rejecting Dr. Meyer's opinion and giving weight to Dr. Crall's opinion. (Dkt. # 20). The Commissioner cites the ALJ's reasoning in support. Id.

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

The analysis of a treating physician's opinion is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference

and must be evaluated in reference to the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(c)(2)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished).

In this case, the ALJ gave little weight to Dr. Meyer's opinion for the following reasons. The ALJ noted that the medical records indicated that plaintiff's treatment record from late 2005 showed quick, significant improvement. (R. 21). Within six months, plaintiff showed no symptoms. Id. Plaintiff's previous psychiatrist declared him to be in remission by March 2007. Id. Plaintiff continued to receive medication management, but as the ALJ noted, his symptoms and panic attacks were "situational." Id.

When plaintiff returned to treatment and began seeing Dr. Meyer in October 2009, Dr. Meyer opined that plaintiff had moderate symptoms but historically responded well to treatment. (R. 22). By March 2010, plaintiff reported taking on more responsibility at home and completing courses through his church and OSU. Id. Dr. Meyer opined that plaintiff had "relatively mild

residual symptoms" in July 2010, despite plaintiff's claims that the issue of employment continued to trigger panic symptoms. (R. 22).

The ALJ found that these facts demonstrated that plaintiff had "engaged with success in activities that may cause stress or anxiety." Id. The ALJ found that plaintiff's abilities, as outlined in Dr. Meyer's notes, conflicted with Dr. Meyer's claims that plaintiff had numerous moderate limitations on work activities and marked limitations in his ability to complete a normal workday/workweek, to perform at a consistent pace, to accept instructions and criticism, and to adapt to changes in the work place. (R. 24-25). The ALJ also found that Dr. Meyer's treatment was limited to "outpatient medication management and brief psychotherapy" "every two to three months." (R. 25). Finally, the ALJ cited Dr. Meyer's failure to submit any reasoning for his findings with respect to plaintiff's limitations. Id. This clear reasoning is sufficient to support the ALJ's decision to give little weight to Dr. Meyer's opinion. Accordingly, the undersigned recommends a finding of no error on this issue.

In addition to challenging the ALJ's treatment of Dr. Meyer's opinion, plaintiff also challenges the ALJ's residual functional capacity findings with respect to the limitations on plaintiff's concentration and plaintiff's transferable skills. (Dkt. # 19). In addressing these issues as part of his residual functional capacity findings, the ALJ analyzed Dr. Crall's opinion. (R. 25). Dr. Crall opined that plaintiff could perform simple and some complex tasks. (R. 24). The ALJ relied heavily on this finding in giving some weight to Dr. Crall's opinion, stating that her findings were consistent with plaintiff's own reports regarding his activities. Id. The ALJ found that plaintiff's university course and his church class on international affairs were complex tasks that plaintiff was able to perform without difficulty. (R. 23, 24). Based on those findings, the ALJ determined that plaintiff could perform complex tasks. (R. 19).

While the ALJ's analysis of Dr. Crall's opinion is not as detailed as his analysis of Dr. Meyer's opinion, the ALJ does apply several of the required factors in explaining his reasoning for giving some weight to Dr. Crall's opinion. He cites the fact that Dr. Crall examined plaintiff and conducted her own tests. (R. 24). Those tests demonstrated that plaintiff had the ability to sustain attention at work, as well as understand, remember, and carry out simple and some complex tasks. Id. Plaintiff has not challenged Dr. Crall's opinion or the ALJ's partial reliance on that opinion.

There is some record evidence to support plaintiff's insinuation that his likelihood of success at work would be better if he were not expected to perform complex tasks. For example, plaintiff consistently reported that he felt overwhelmed when he was required to do too many things at once. (R. 422, 457, 458, 553). However, plaintiff is a college graduate who was able to work for many years as a skilled professional. Plaintiff also was able to work for almost five years after first experiencing symptoms of anxiety and panic disorder, even with the added stress of his mother's death. (R. 388-91, 430-32). Additionally, the ALJ cited only semi-skilled jobs with SVP of 3 and 4 as other work plaintiff could perform (R. 27), which would not require plaintiff to perform complex tasks on a continuous basis. See 20 C.F.R. § 404.1568 (defining semi-skilled work as "work which needs some skills but does not require doing the more complex work duties."). Semi-skilled work is consistent with Dr. Crall's opinion, which the ALJ found should be afforded some weight. Therefore, even if the ALJ erred at step four by finding that there was no limitation on plaintiff's ability to perform complex work, that error was harmless. See Chrisman v. Colvin, 531 Fed.Appx. 893, 899-900 (10th Cir. 2013) (unpublished) (holding that the ALJ's failure include all of the limitations from the residual functional capacity findings in his hypothetical to the vocational expert was harmless error when the other work

identified mirrored the ALJ's findings, resulting in no prejudice to the claimant). Accordingly, the ALJ's findings are supported by substantial evidence in the record and are consistent with the ALJ's ultimate determination that plaintiff is not disabled. (R. 26).

For these reasons, the undersigned recommends a finding that the ALJ's residual functional capacity findings are supported by substantial evidence because he properly analyzed Dr. Meyer's opinion and the evidence in the administrative record as a whole.

**Credibility**

Finally, plaintiff argues that the ALJ failed to link specific evidence in the record to his finding that plaintiff was not entirely credible. (Dkt. # 19). The Commissioner argues that the ALJ's credibility findings are sufficiently detailed to support his conclusion that plaintiff was only partially credible. (Dkt. # 20).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ's credibility findings are interwoven with his analysis of the evidence at step four. (R. 19-25). The ALJ stated that he did "not discount all of the claimant's complaints." (R. 25). The ALJ cited plaintiff's strong work history as a social worker as evidence that weighed in favor of finding plaintiff credible. Id. However, the ALJ also found that the medical evidence, particularly the evidence of plaintiff's strong progress, his satisfactory response to medication management to control his symptoms, and plaintiff's own reports about his activities, conflicted with plaintiff's claims of disability. (R. 19-25). The ALJ placed great emphasis on plaintiff's activities of daily living, specifically his participation in a college extension course and a church class on international affairs. (R. 23).

Because the ALJ cited specific evidence to support his credibility findings, the undersigned recommends a finding of no error on this issue.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision at step five in this case be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by February 18, 2014.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also

28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 4th day of February, 2014.

T. Lane Wilson
United States Magistrate Judge