UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MARK M. NORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-0378-CVE-TLW |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On February 4, 2014, Magistrate Judge T. Lane Wilson entered a report and recommendation (Dkt. # 26) recommending that the Court affirm the decision of the Commissioner of the Social Security Administration to deny plaintiff's claim for disability benefits. Plaintiff has filed an objection to the report and recommendation, and requests either an award of benefits or a remand of the case for further administrative proceedings. Dkt. # 29. Plaintiff argues that the administrative law judge (ALJ) incorrectly determined his residual functional capacity (RFC), failed to properly formulate his hypothetical questions to the vocational expert (VE), failed to properly consider medical evidence, and weighed plaintiff's credibility incorrectly. Id.

## I.

On April 14, 2009, plaintiff applied for disability benefits, Dkt. # 18-5, at 2, alleging that he has been unable to work since August 30, 2005, because of his disabling condition. Id. Plaintiff had worked as a social worker from 1979 until his disability onset date. Dkt. # 18-2, at 26. Plaintiff alleges that "Depression, Post Traumatic Stress Disorder, High Blood Pressure, Acute Anxiety

Attacks, Asthma, [and] Diabetes" limit his ability to work. Dkt. # 18-6, at 3. Plaintiff's claim was initially denied on June 2, 2009, and again on reconsideration on December 10, 2009. Dkt. # 18-3.

Plaintiff requested a hearing before an ALJ, and a hearing was held on August 12, 2010. Dkt. # 18-4, at 11-12; Dkt. # 18-2, at 35. Plaintiff appeared at the hearing and was represented by an attorney. Dkt. # 18-2, at 35-36. Plaintiff was fifty-eight years old on the date of the hearing. Id. at 36-37. He lives with his wife and a son. Id. at 37. His income consists of a pension and rental income from a house he owns. Id. at 38.[1] Plaintiff has a bachelor of arts and majored in Spanish. Id. at 39-40. Plaintiff has been seeing psychiatrists at Laureate Psychiatric Clinic and Hospital (Laureate) since October 2005. Id. at 58.[2]

Plaintiff stated that, in December 2005, he quit his job at the Oklahoma Department of Human Services because of stress, anxiety, and panic attacks. Id. at 45. His symptoms had begun in February 2005, but he continued to receive satisfactory reviews until August 2005. Id. at 46-47. At that point, he was informed that his timeliness and accuracy rates were not satisfactory. Id. at 47-48. Plaintiff then informed his supervisor that he could no longer work for the Department of Human Services. Id. Plaintiff testified that his symptoms worsened when he dealt with the public and that multitasking triggered his symptoms. Id. at 46-47. Plaintiff stated that, due to his panic attacks, he had to take leave under the Family Medical Leave Act in 2001 and 2003. Id. at 48. In 2007, plaintiff applied and interviewed for a telemarketing position with Floral Haven as a prepaid

---

[1]   Plaintiff also testified that his wife would sometimes work as an instructor for Tulsa Community College and that she would begin working there again on the Monday following the hearing. Dkt. # 18-2, at 38.

[2]   Plaintiff began treatment, without seeing a psychiatrist, at Laureate in 2003. Dkt. # 18-2, at 58.

burial salesman. Id. at 53-54.[3]  However, he was not hired.  Id.  Plaintiff stated that, in July 2010, he worked for two days in a jury focus group for Consumer Logic.  Id. at 39.  In May 2010, he had applied for a job with the Census Bureau.  Id. at 49.  However, plaintiff stated that, when he attempted to go to orientation, he suffered the worst panic attack that he had ever had.  Id.  Plaintiff stated that he was unable to leave his home and that he was unable to take the job with the Census Bureau.  Id.  Plaintiff did not have any other job interviews.  Id. at 54.

Plaintiff has a driver's license and is able to go to places such as grocery stores and movie theaters.  Id. at 37, 51.  Plaintiff stated that he is able to do household chores as long as he does not have to multitask.  Id. at 50.  Plaintiff reads, watches television, plays basketball, collects coins, and travels.  Id. at 50.  Plaintiff stated that he is able to deal with the general public.  Id. at 51.  Plaintiff is a member of a church group that meets twice a month and deals with federal and state governmental issues.  Id.  However, plaintiff stated that he had not been able to attend church until two months before the hearing.  Id. at 52.  Plaintiff stated that his mother passed away in 2004, and that that was very traumatic for him.  Id. at 52.

A second hearing was held on February 15, 2011, and plaintiff was again represented by counsel.  Id. at 66.[4]  The ALJ called a VE, Anne Herron Young, to testify.  Id. at 67, 70.  Young testified that plaintiff's former employment as a social worker was skilled and had a specific vocational preparation (SVP) level of 7.  Id. at 71.  The VE further testified that the position of social worker is "generally performed at sedentary exertion," that "exertion levels do vary as to work

---

[3]      The ALJ later stated that plaintiff had ten interviews for telemarketing positions in 2007. Dkt. # 18-2, at 70.

[4]      The original hearing had been adjourned because not all of plaintiff's medical records had been provided to the ALJ. Dkt. # 18-2, at 61-63.

setting and assignment," and that the exertion level of plaintiff's job was medium.  Id.  The ALJ

posed a hypothetical question[5] to the VE.  Id. at 72.  The VE testified that the hypothetical claimant

could not perform plaintiff's past relevant work.  Id.  However, the VE testified that plaintiff's skills

in data entry and office procedures would be transferrable.  Id.  The VE further testified that the

hypothetical claimant could perform semiskilled work as a data entry clerk or as a filing clerk.  Id.

at 72-73.  The VE also testified that it was possible that the hypothetical claimant could work as a

telephone answerer.  Id. at 73-74.  The ALJ then added an additional limitation of superficial contact

with supervisors and coworkers and no contact with the public.  Id. at 74.  The VE testified that the

hypothetical claimant would be able to work as a data entry clerk or as a filing clerk, but not as a

telephone answerer.  Id.  Finally, the ALJ asked a hypothetical question[6] that assumed the claimant

would suffer from panic attacks that would prevent him from attending work two days a month.  Id.

---

[5]     The question was:

> [A]ssume an individual who is 53 years old at the time of application, but who's present -- or at least at the time of the alleged onset date, but who's presently 58 years old and has a college education and work experience as you've outlined in your testimony today.  In the first hypothetical, the individual would be able to lift 50 pounds occasionally/25 pounds frequently with pushing and pulling consistent with the lifting and carrying restrictions. The individual could stand or walk for six hours out of an eight-hour day provided that he avoided concentrated exposure to fumes, odors, dusts, toxins, gases, and poor ventilation.  The individual would need to avoid intense interpersonal contacts with coworkers, supervisors, and the public.

Dkt. # 18-2, at 72.

[6]     The question was:

> [I]f as a result of going to work at those or other occupations he sustained panic attacks or if in the thought of going to work he sustained panic attacks that prevented him from attending work or having to leave work substantially two or more days a month, would he be able to perform those jobs already mentioned or other jobs?

Dkt. # 18-2, at 74.

The VE testified that, under those circumstances, the hypothetical claimant would be unable to perform any job. Id. Plaintiff's attorney then asked the VE a hypothetical question that included a marked limitation in the ability to complete a workweek or workday at a consistent pace without an unreasonable number of breaks, a marked limitation in the ability to accept instructions and respond to criticism from supervisors, and a marked limitation in the ability to respond to changes in the workplace.[7] Id. at 75. The ALJ stated that under those conditions, the hypothetical claimant would be disabled. Id.

On March 18, 2011, the ALJ entered a written decision denying plaintiff's claim for disability benefits. Dkt. # 18-2, at 14-28. The ALJ found that plaintiff had not engaged in substantial gainful activity from August 30, 2005, to December 31, 2010. Id. at 16.[8] The ALJ found that plaintiff had the severe impairments of asthma, panic disorder, post-traumatic stress disorder, and obesity. Id. The ALJ found that plaintiff's physical impairments of hypertension, diabetes mellitus, and hearing loss were nonsevere impairments. Id. at 17.

The ALJ found that none of those impairments, nor any combination of those impairments, met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. In determining whether plaintiff met or medically equaled the listed impairments, the ALJ concluded that plaintiff has mild restrictions in activities of daily living, moderate difficulties in social function,

---

[7]     The hypothetical question assumed a claimant that had the same physical limitations as in the ALJ's hypothetical questions, but the marked mental limitations set forth in plaintiff's treating physician's mental medical source statement. Dkt. # 18-2, at 75; Dkt. # 18-7, at 223-26.

[8]     Although plaintiff had worked for two days as part of a jury focus group in July 2010, the ALJ found that that work was not substantial work activity. Dkt. # 18-2, at 16.

and moderate difficulties with regard to concentration, persistence, or pace.[9] Id. at 18-19.  There

was no evidence of decompensation in the record.  Id. at 19.  The ALJ also took note of plaintiff's

obesity during this stage.  Id. at 18.  To reach these conclusions, the ALJ relied on the findings of

the consultive medical examiner, plaintiff's statements, and plaintiff's function report.  Id. at 18-19.

The ALJ then reviewed plaintiff's testimony, plaintiff's function report, and the medical

evidence.  Id. at 20-26.  Plaintiff had been diagnosed with obesity, hypertension, and asthma.  Id.

at 21.  However, plaintiff's physician stated that plaintiff's asthma caused no real limitation.  Id.

Plaintiff used Albuterol once every two days and did not experience any nighttime awakenings.  Id.

Plaintiff began treatment for panic on September 16, 2003, when he visited Laureate for

interventions.  Id.  A social worker wrote in an assessment that plaintiff's past failures and anxiety

led to a continued fear of failing.  Id. at 22.  However, the social worker wrote that plaintiff "felt

positive and confident about the reintroduction of medication."  Id.  On October 27, 2003, progress

notes demonstrated that the social worker felt plaintiff could return to work, appeared confident, had

a good response to his medication, and had used the techniques and interventions suggested in

therapy.  Id.

On October 11, 2005, plaintiff was diagnosed with panic disorder with agoraphobia and post-

traumatic stress disorder.  Id.  Plaintiff's treating psychiatrist assigned plaintiff a Global Assessment

of Functioning (GAF) score of 50.  Id.  By November 11, 2005, the treating psychiatrist believed

---

[9]      In determining that plaintiff has moderate difficulties with regard to concentration,
persistence, or pace, the ALJ considered plaintiff's testimony that multi-tasking causes panic
attacks; plaintiff's statements in his function report that he follows written instructions well,
that he understands spoken instructions (although he forgets about half of his spoken
instructions as he is completing them), and that he has a concentration span of about twenty
to thirty minutes (although it was once one to two hours); and plaintiff's demonstration of
good abilities in that functional area during a mental status evaluation.  Dkt. # 18-2, at 19.

plaintiff's symptoms were well controlled, and the psychiatrist assigned plaintiff a GAF score of 60-70. Id.  By March 6, 2006, plaintiff's GAF score was 90, and the treating psychiatrist remarked that plaintiff was doing well.  Id.  Plaintiff "underwent continued medication management at Laureate." Id.

"On November 12, 2007, medication management notes state an assessment that [plaintiff] had experienced a panic attack due to job applications."  Id.  However, plaintiff's treating psychiatrist listed plaintiff's GAF score as 95-100, despite another diagnosis of panic disorder and post-traumatic stress disorder.  Id.  By February 2008, plaintiff's mood was usually "ok," his concentration was good, his sleep was "ok," and his anxiety was good.  Id.  However, the medical records state that plaintiff continued to have situational panic attacks.  Id.  By October 2008, plaintiff was having no panic attacks and was having anxiety only when interviewing for jobs.  Id.  On February 23, 2009, plaintiff was able to apply for employment without panic attacks.  Id.  Plaintiff was taking Elavil and Zoloft to control his symptoms.  Id.

On October 8, 2009, plaintiff's care was transferred to a new treating psychiatrist.  Id. Plaintiff stated that his anxiety was better since retiring and that his current medications were well tolerated and quite helpful.  Id.  He also stated that he "periodically felt anxious in response to stressors and had intermittent panic attacks, usually triggered by specific situations, such as interviews for a part-time job or issues related to the settlement of his late mother's estate."  Id.  The new treating psychiatrist diagnosed plaintiff with "panic disorder, without agoraphobia, and prior diagnosis of post-traumatic stress disorder."  Id. at 23.  He assigned plaintiff a GAF score of 60.  Id.

Records from March 29, 2010, state that plaintiff was taking a course on international affairs at his church and that he had finished an extension course at Oklahoma State University.  Id.

7

However, on July 1, 2010, plaintiff reported to his treating psychiatrist that he suffered a panic attack after applying for a job with the Census Bureau.  Id.  He described it as the worst attack he had ever experienced.  Id.  Plaintiff reported that attending classes did not cause anxiety; his anxiety is triggered by employment-related experiences that he associates with his past job experiences.  Id. The psychiatrist assessed plaintiff as having "a history of panic disorder, currently with relatively mild residual symptoms."  Id. The psychiatrist believed plaintiff was making progress in increasing the range of his activities.  Id.  Plaintiff stated that his current medications were well tolerated and helpful.  Id.

On January 19, 2010, plaintiff's treating psychiatrist completed a mental medical source statement.  Id. at 25.  The psychiatrist stated that plaintiff had a host of moderate limitations[10] and

> marked limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the

---

[10]    The treating psychiatrist listed moderate limitations in
> the ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to understand and remember detailed instructions, the ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, the ability to make simple work related decisions, the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to be aware of normal hazards and take appropriate precautions, and the ability to set realistic goals or make plans independently of others.

Dkt. # 18-2, at 25.

> ability to accept instructions and respond appropriately to criticism from supervisors, the ability to respond appropriately to changes in the work setting, and the ability to travel to unfamiliar places or use public transportation.

Id. The ALJ found that the treating psychiatrist had been treating plaintiff since October 2009 and treated plaintiff on an outpatient basis once every two or three months. Id. at 26. The ALJ further found that the treatment "consisted of outpatient medication management and brief psychotherapy during medication management." Id.

The ALJ did not afford the medical source statement controlling weight, because he found it to be inconsistent with the other evidence in the case. Id. The ALJ cited the fact that plaintiff took classes at his church and at Oklahoma State University and the fact that plaintiff was taking on more responsibility at home. Id. The ALJ found that the treating psychiatrist did not submit any objective medical findings to support the medical source statement's conclusions and that plaintiff's medical records did not support the degree of limitation identified by the medical source statement. Id. Specifically, the ALJ noted that plaintiff's medical records describe plaintiff's panic disorder as having relatively mild residual symptoms, that plaintiff was making progress "with increasing the range of his activities," that plaintiff's mood and quality of life had significantly improved, and that plaintiff found his medications to be well tolerated and helpful. Id. The ALJ concluded that the treating psychiatrist's medical source statement should be afforded "little weight." Id.

Plaintiff underwent a psychological consultive exam on October 28, 2009. Id. at 23. Plaintiff was oriented, alert, pleasant, and cooperative with the consulting examiner. Id. Plaintiff reported symptoms of poor concentration, feeling overwhelmed, excessive worrying, and being unable to "'emotionally handle things.'" Id. Plaintiff reported having panic attacks two or three times a month since December 2005 and experiencing a depressed mood, accompanied by a

decreased energy level and poor concentration, roughly every two weeks.  Id.  The consulting

psychologist performed a mental status evaluation, and plaintiff demonstrated "good abilities."  Id.

The consulting psychologist diagnosed plaintiff with "generalized anxiety disorder, panic disorder

without agoraphobia, and depressive disorder, not otherwise specified."  Id.

The consulting examiner also offered opinion evidence as to plaintiff's abilities.  Id. at 25.

She believed that plaintiff's "ability to engage in work-related mental activities, such as sustaining

attention, understanding, and remembering, and to persist at such activities was likely adequate for

simple and some complex tasks."  Id.  The ALJ accorded this opinion some weight, to the extent it

was consistent with his RFC determination.  Id.  In particular, the ALJ believed that plaintiff had no

limitation in his ability to perform complex tasks, as evidenced by his ability to take classes at his

church and at a university.  Id.

The ALJ also considered plaintiff's credibility.  Id. at 23-27.  Because of discrepancies

between plaintiff's alleged symptoms and the objective documentation on file, the ALJ determined

that plaintiff's "statements about his impairments and their impact on his ability to perform activities

of daily living and basic functions are not entirely credible."  Id. at 23.  The ALJ found that

plaintiff's daily activities were not limited to the extent that one would expect, given plaintiff's

complaints of disabling symptoms.  Id. at 24.  The ALJ also noted that plaintiff had learned

techniques to control his panic, had made significant progress in expanding the range of his

activities, and was responding well to medication.  Id.  While acknowledging plaintiff's claims as

to the nature of his panic attacks, the ALJ found that "the record shows [plaintiff is] able to engage

in activities that involve stress," such as the classes he was taking through the university and his

church.  Id.  The ALJ found that, with medication and therapy, plaintiff's symptoms are not so

10

severe as to prevent plaintiff from working.  Id.[11]  The ALJ found that inconsistency existed "regarding functional limitations and allegations, yielding to a partial allegation credibility assumption." Id.  The ALJ did determine that plaintiff had a strong work history and found that this evidence weighed in favor of plaintiff's credibility.  Id. at 26.

The ALJ mentions a medical status report, dated March 29, 2000, that states plaintiff was disabled due to stress.  Id. at 24.  The report does not describe plaintiff's illness.  Id.  Because the determination of whether someone is "disabled" is reserved to the Commissioner, the ALJ did not give the report special significance or controlling weight.  Id. at 25.

The ALJ also considered the medical source opinions of the State medical examiners.  Id. at 26.  Those consultants determined plaintiff's physical and mental impairments to be nonsevere. Id.  The ALJ found that plaintiff's impairments were more limiting than was concluded by the State examiners.  Id.

Based on the objective medical evidence and other evidence, the ALJ determined plaintiff's RFC.  Id. at 20-27.  The ALJ found that plaintiff had the RFC "to perform medium work as defined in 20 C.F.R. 404.1567(c) except he must avoid concentrated exposure to fumes, odors, dusts, toxins, gases, and poor ventilation. [Plaintiff] is limited to superficial contact with coworkers and supervisors, and no contact with the public." Id. at 20.  The ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these

---

[11]     The ALJ did add a restriction of "superficial contact with coworkers and supervisors, and no contact with the public" to avoid exacerbating plaintiff's symptoms.  Dkt. # 18-2, at 24.

symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." Id. at 21.

The ALJ found that plaintiff is unable to perform any past relevant work. Id. at 27. The ALJ determined, based on the VE's testimony, that plaintiff's past work as a social worker was skilled, had an SVP code of 7, and required skills in data entry and office procedures. Id. The ALJ further determined that plaintiff had acquired works skills "that were transferable to other occupations with jobs existing in significant numbers in the national economy." Id. The ALJ stated, based on the testimony of the VE, that plaintiff could perform the requirements of data entry clerk or filing clerk. Id. at 28. The ALJ concluded that plaintiff was not disabled. Id.

On May 10, 2012, the Appeals Council denied plaintiff's request for review. Id. at 2-4. When the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision. Wiederholt v. Barnhart, 121 Fed. App'x 833, 836 (10th Cir. 2005).[12] Plaintiff filed this case seeking judicial review of the Commissioner's decision (Dkt. # 2), and the matter was referred to a magistrate judge for a report and recommendation. After the matter was fully briefed, the magistrate judge entered a report and recommendation recommending that the Commissioner's decision to deny plaintiff's claim for disability benefits be affirmed. Dkt. # 26. Plaintiff has filed an objection (Dkt. # 29) to the report and recommendation, but defendant has not filed a response to plaintiff's objection and the time for defendant to respond has expired.

---

[12]     This and all other unpublished opinions are not precedential but are cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

## II.

Without consent of the parties, the Court may refer any pretrial matter dispositive of a claim to a magistrate judge for a report and recommendation.  However, the parties may object to the magistrate judge's recommendation within fourteen days of service of the recommendation. Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 975 (10th Cir. 2002); Vega v. Suthers, 195 F.3d 573, 579 (10th Cir. 1999).  The Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The Court may accept, reject, or modify the report and recommendation of the magistrate judge in whole or in part.  Fed. R. Civ. P. 72(b).

## III.

The Social Security Administration has established a five-step process to review claims for disability benefits.  See 20 C.F.R. § 404.1520.  The Tenth Circuit has outlined the five step process:

> Step one requires the agency to determine whether a claimant is "presently engaged in substantial gainful activity." [Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004)].  If not, the agency proceeds to consider, at step two, whether a claimant has "a medically severe impairment or impairments."  Id.  An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities.  See 20 C.F.R. § 404.1521.  At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation."  Allen, 357 F.3d at 1142.  If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work.  See Id.  Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy.  See Id.

Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  The ALJ decided this case at step five of the analysis and found that, given his RFC, age, work experience, and education, plaintiff "had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy."  Dkt. # 18-2, at 27.

13

The Court may not reweigh the evidence or substitute its judgment for that of the ALJ. Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008).   Instead, the Court reviews the record to determine if the ALJ applied the correct legal standard and if his decision is supported by substantial evidence. Id. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court must meticulously examine the record as a whole and consider any evidence that detracts from the Commissioner's decision.  Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).

Plaintiff raises three objections to the magistrate judge's report.  Dkt. # 29.  Plaintiff argues that the ALJ's RFC determination and hypothetical questions to the VE were flawed, that the ALJ failed to properly consider medical evidence, and that the ALJ's incorrectly assessed plaintiff's credibility.  Id.

**A.  Hypothetical Questions to Vocational Expert and RFC Determination**

Plaintiff argues that the ALJ erred by failing to include plaintiff's moderate limitation of concentration, persistence, or pace in his hypothetical to the VE.  Id. at 1.  Plaintiff also argues that the ALJ erred by failing to include that limitation in his RFC.  Id. at 2, 4.  The ALJ found that, with regard to concentration, persistence, or pace, claimant has moderate difficulties.  Dkt. # 18-2, at 19. Neither the ALJ's hypothetical questions, nor his decisional RFC, explicitly included a moderate limitation on concentration, persistence, or pace.  Id. at 20, 72-74.

14

Plaintiff's concentration, persistence, or pace limitation is a "paragraph B" limitation, used during step 2 and 3 of the evaluation process.  Id. at 27-28.

> [T]he limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . .

SSR 96-8p, 1996 WL 374184, at *4.  An ALJ is not required to include paragraph B limitations in his questions to the VE.  See Jimison ex rel. Sims v. Colvin, 513 Fed. App'x 789, 793 (10th Cir. 2013) (holding that a hypothetical to a VE needs to contain only the claimant's functional limitations and restrictions and is not required to include paragraph B limitations).  None of the published Tenth Circuit cases cited by plaintiff contradicts this rule.[13]  The ALJ did not err by failing to include plaintiff's moderate limitation of concentration, persistence, or pace in his hypothetical to the VE,

---

[13]    A number of these cases state only general rules and do not address non-severe paragraph B limitations.  See Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000); Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1996); Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995); Hargis v. Sullivan, 945 F.2d 1482, 1491-92 (10th Cir. 1991).  The quote in Chapo v. Astrue, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012) ("[T]he failure of the ALJ to include his own mental restriction would be fatal to the validity of the hypothetical to the VE."), cited to by plaintiff, refers not to paragraph B limitations, but to the restriction to "simple, unskilled work."  Id.  Wells v. Colvin, 727 F.3d 1061, 1065 & n.3 (10th Cir. 2013), stands only for the proposition that paragraph B limitations must be further analyzed by the ALJ when crafting an RFC, not that those limitations must be part of the RFC or included in a hypothetical question to a VE.  Frantz v. Astrue, 509 F.3d 1299, 1303 n.3 (10th Cir. 2007), suggests, in dicta, that the ALJ should include paragraph B limitations in his RFC determination.  The opinion does not discuss what questions must be asked of a VE.  See generally id.  Additionally, a recent, albeit unpublished, decision suggests that Frantz does not even require "an ALJ's RFC assessment to mirror his step three-findings."  Beasley v. Colvin, 520 Fed. App'x 748, 754 n.3 (10th Cir. 2013).

because that limitation is not, itself, a functional limitation.[14]   However, if that paragraph B limitation resulted in a functional limitation that must be include in plaintiff's RFC, then that functional limitation must be included in the ALJ's hypothetical questions to the VE.

The ALJ did err in failing to adequately analyze plaintiff's moderate limitation of concentration, persistence, or pace to determine whether it resulted in a functional limitation that must be included in the plaintiff's RFC (and, ultimately, the ALJ's hypothetical questions to the VE).  If, at step two of the claims process, an ALJ finds that a paragraph B limitation exists, the ALJ must further analyze the limitation to determine if it requires any work restrictions to be included in the RFC.  Wells v. Colvin, 727 F.3d 1061, 1065 & n.3 (10th Cir. 2013); see also SSR 96-8p, 1996 WL 374184 ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . .").  The ALJ's analysis is insufficient.

Plaintiff's RFC does not include any limitations designed to accommodate plaintiff's problems with concentration, persistence, or pace.  Dkt. # 18-2, at 20.  The ALJ's decision does occasionally reference plaintiff's concentration, persistence, or pace.[15]   See generally id. at 20-27. Additionally, the ALJ does offer some analysis as to why he accorded only some weight to the

---

[14]    Although a paragraph B limitation is not a functional limitation, a claimant's paragraph B limitation may cause a claimant to suffer a functional limitation.

[15]    The ALJ noted a medical record stating that plaintiff's concentration was good. Dkt. # 18-2 at 22.  The ALJ stated that plaintiff complained to a consultive examiner of poor concentration.  Id. at 23.  Additionally, the ALJ mentioned the treating psychiatrist's findings as to concentration, persistence, and pace, and the consulting psychologist's determination that plaintiff's ability to sustain attention and persistence are adequate for simple and some complex tasks.  Id. at 25.  The ALJ also made reference to plaintiff's alleged lack of stamina, although it is unclear if that was intended to be synonymous with plaintiff's concentration, persistence, or pace.  Id. at 21, 24.

consulting psychologist's opinion that plaintiff's "ability to engage in work-related mental activities, such as sustaining attention, understanding, and remembering, and to persist at such activities, was likely adequate for simple and some complex tasks." Id. at 25 (stating that, while the consulting examiner had the opportunity to examine plaintiff, plaintiff had demonstrated the ability to accomplish complex tasks, such as taking university and church classes). Likewise, the ALJ explains why he accorded little weight to the treating physician's assessment (which included limitations of concentration, persistence, and pace), but none of his reasons applies specifically to plaintiff's difficulties with concentration, persistence, or pace. See id. at 26. Those analyses are general in nature. There is no specific analysis as to why plaintiff's moderate limitation in concentration, persistence, or pace should or should not have resulted in a functional limitation in plaintiff's RFC. Because the ALJ found that a paragraph B limitation existed, he must analyze whether, as a result of that limitation, an additional functional limitation must have been included in plaintiff's RFC. See Wells, 727 F.3d at 1065 & n.3. His failure to do so is error and must be corrected upon remand.

Plaintiff also argues that severe impairments prevent a claimant from being able to possess transferable skills. Dkt. # 29, at 3. Plaintiff argues, citing Nicholas v. Colvin, No. EDCV 12-2124-JPR, 2013 WL 5310848, at *8 (C.D. Cal. Sep. 20, 2013), that a limitation to simple, repetitive tasks precludes the use of transferable skills. Dkt. # 29, at 3-4. However, plaintiff's RFC does not include a limitation to simple, repetitive tasks. Dkt. # 18-2, at 20. Plaintiff does not argue that plaintiff's RFC must include a limitation to simple, repetitive tasks. See Dkt. # 29, at 3 (admitting that a moderate limitation of concentration, persistence, or pace is accounted for with a limitation to

simple, repetitive tasks in only some -- as opposed to all -- cases).  Therefore, plaintiff's argument is inapposite.

Plaintiff also argues, citing Witherspoon v. Comm'r of Soc. Sec., No. 09-12847, 2010 WL 2231891, at *6 (E.D. Mich. June 3, 2010), that a severe mental limitation prevents the performance of semiskilled and skilled work.  Dkt. # 29, at 3.  However, that case is distinguishable.  In Witherspoon, "[t]he social security agency initially found him able to do simple, unskilled work; it was only on appeal to the ALJ that suddenly he could perform skilled work."  2010 WL 2231891, at *6.  There was no such initial finding in this case.  A finding that a claimant has a severe mental impairment does not necessarily preclude the performance of semiskilled work.  See Henry v. Sec'y of Health & Human Servs., No. 89-1012, 1989 WL 100344, at *2 (6th Cir. Aug. 31, 1989).  The ALJ did not err in finding that plaintiff could perform semiskilled work.

## B.  Medical Evidence

Plaintiff argues that the ALJ failed to accord the proper weight to the treating psychiatrist's medical source statement.  Dkt. # 29, at 4-7.  The ALJ accorded the treating psychiatrist's opinion little weight.  Dkt. # 18-2, at 26.

In Social Security disability proceedings, a treating physician's medical opinion is entitled to controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Krauser v. Astrue, 638 F.3d 1324, 1330 (10th Cir. 2011) (quoting Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2000)).  If the treating physician offers a medical opinion, the ALJ must engage in a two-step inquiry to determine what weight that opinion should be given.  First, the ALJ must determine if the opinion is well-supported by medically acceptable clinical or diagnostic evidence and if it is

consistent with other evidence in the administrative record. Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir. 2004). Second, treating medical source evidence is entitled to some deference, even if not controlling weight, and the ALJ must evaluate the evidence under the factors stated in 20 C.F.R. § 404.1527. Id. To determine the deference the treating medical source evidence should be accorded, the ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Goatcher v. U.S. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995). If a treating physician's opinion is rejected, the ALJ must provide specific, legitimate reasons for doing so. Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987).

The ALJ provides two reasons for finding the treating physician's medical source statement not controlling: it is inconsistent with other medical evidence in the case and it is not well-supported by clinical or diagnostic evidence. Dkt. # 18-2, at 26. The ALJ lists the evidence that he finds inconsistent with the treating physician's medical source statement: plaintiff completed university and church classes; plaintiff has taken on more responsibility at home; plaintiff's most recent treatment records state that plaintiff currently has relatively mild residual symptoms, that plaintiff is making progress in "increasing the range of his activities," that plaintiff's quality of life and mood are improving significantly, that plaintiff's mood is at baseline, and that plaintiff has stated that his medications are well tolerated and helpful at the current dose. Id. None of this evidence is inconsistent with the medical source statement. The medical source statement states that "[e]ach

19

mental activity is to be evaluated within the context on the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis."   Dkt. # 18-7, at 223. Therefore, the treating physician's opinion was estimating plaintiff's capabilities if he were to return to work.  Plaintiff's panic attacks are situational.  Dkt. # 18-2, at 22.  Plaintiff often has attacks when applying for jobs and due to stress at work.  See e.g., id. at 22, 46-47.  The treating physician's belief that returning to work would lead to an exacerbation of plaintiff's symptoms is not contradicted by evidence suggesting that plaintiff has been able to improve or control his symptoms while not at work, nor is it contradicted by evidence suggesting that plaintiff is able to complete classes or take on responsibility at home.

The ALJ also states that plaintiff's treatment by the treating physician and the treating physician's objective medical findings do not support the treating physician's opinion.  Dkt. # 18-2, at 26.  The ALJ does not identify why he believes the opinion is not well-supported by medically acceptable clinical or diagnostic evidence.  See id.  The ALJ previously noted medical records that suggest plaintiff's panic attacks affect his ability to work.  Id. at 21-22.  These records appear to provide the basis for the treating psychiatrist's opinions regarding plaintiff's limitations during a normal workday and workweek.  See SSR 96-2p, 1996 WL 374188, at *2 ("For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence.").  The ALJ has failed to provide specific reasons why the treating physician's opinion is not well-supported by medically acceptable clinical or diagnostic evidence or how it is inconsistent with other evidence in the administrative record.  Upon remand, the ALJ must do so, or accord the treating physician's opinion controlling weight.

Plaintiff also argues that the ALJ improperly discounted portions of a consulting examiner's findings because he failed to make clear how he came to his conclusion that the examiner's findings should be discounted to the extent that they state that plaintiff could not perform all complex tasks. Dkt. # 29, at 7-8.  The ALJ provided his reason for discounting the examiner's findings: he believed that the finding that plaintiff could not perform some complex tasks was contradicted by the record. Dkt. # 18-2, at 25.  The ALJ cited to plaintiff's attendance of university and church classes in support of this contention.  Id.  This explanation is sufficient to vitiate plaintiff's allegation that the ALJ failed to explain his reasoning.

## C.  Credibility Determination

Plaintiff argues that the ALJ failed to perform a proper credibility determination.  Dkt. # 29, at 9-12.  "Credibility determinations are peculiarly the province of the finder of fact," and such determinations are not to be upset "when supported by substantial evidence."  Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).  Nonetheless, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence."  Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988).  Factors the ALJ may weigh in determining a claimant's credibility include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Id. at 1132. However, an ALJ does not need to provide a "formalistic factor-by-factor review of the evidence;" an ALJ needs only to "set[] forth the specific evidence he relies on in evaluating the claimant's credibility."  Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  Common sense

21

should guide the review of an ALJ's credibility determination and technical perfection is not required.  Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166-67 (10th Cir. 2012).

Plaintiff argues that the ALJ must identify which of plaintiff's statements he finds credible and which of plaintiff's statements he finds incredible.  Dkt. # 29, at 9.  As long as an ALJ explains the extent to which he credits a claimant's testimony when determining the limiting effects of the claimant's symptoms, an ALJ is not required to identify specific incredible statements.  Keyes-Zachary, 695 F.3d at 1169-70.[16]  In his decision, the ALJ makes clear that he discounts the plaintiff's testimony to the extent it conflicts with his RFC and to the extent it alleges that plaintiff is unable to work.  Dkt. # 18-2, at 24, 26-27.  Because the ALJ explained the extent to which he credited plaintiff's testimony in determining the limiting effects of plaintiff's symptoms, the ALJ did not err by failing to identify which statements the ALJ found credible and which statements the ALJ found incredible.

Plaintiff argues that the ALJ failed to discuss, even minimally, the required credibility factors.  Dkt. # 29, at 9.  The ALJ stated his reasoning for determining that plaintiff was only partially credible.  Dkt. # 18-2, at 23-27.  He determined that plaintiff's description of impact of his impairments on his basic functions and activities of daily living was not particularly credible because of discrepancies between objective documentation and plaintiff's alleged symptoms.  Id. at 23.  The ALJ concluded that plaintiff's activities of daily living were less limited than would be expected of someone who was disabled.  Id. at 24.  The ALJ also considered that plaintiff is

---

[16]     The case cited in support of plaintiff's position, Hayden v. Barnhart, 374 F.3d 986 (10th Cir. 2004), stands for the proposition that an ALJ's credibility determination must be supported by sufficient evidence, not that the ALJ must identify which statements he finds credible and which statements he finds incredible.  Id. at 992-94.

responding well to his medication, that plaintiff has learned techniques to control his panic, and that plaintiff has increased the range of his activities. Id. The ALJ noted that "the record shows [plaintiff is] able to engage in activities that involve stress," such as university and church classes. Id. The ALJ concluded that plaintiff's symptoms were not so severe that plaintiff could not work if he were to take medication and continue treatment. Id. The ALJ found these inconsistencies between plaintiff's functional limitations and his allegations led to a "partial allegation credibility assumption." Id. However, the ALJ also considered plaintiff's work history in assessing his credibility, and he determined that it made plaintiff more credible. Id. at 26.

The ALJ set out the specific evidence he relied on in evaluating plaintiff's credibility. See Qualls, 206 F.3d at 1372. He specifically considered plaintiff's medication and treatment, the nature of his daily activities, and the consistency or compatibility of nonmedical testimony with objective medical evidence. See Huston, 838 F.2d at 1132. He also considered plaintiff's work history. The ALJ's credibility determination is closely and affirmatively linked to substantial evidence. See id. at 1133. This Court should not, and will not, upset that determination. Diaz, 898 F.2d at 777.

The remainder of plaintiff's objections to the magistrate judge's credibility analysis essentially ask this Court to reweigh the evidence and find that plaintiff is credible. Dkt. # 29, at 10-13. "Credibility determinations are peculiarly the province of the finder of fact," and such determinations are not to be upset "when supported by substantial evidence." Diaz, 898 F.2d at 777. This Court may not reweigh evidence to disturb the finding of the ALJ. Daniels v. Apfel, 154 F.3d 1129, 1135 n.8 (10th Cir. 1998). The ALJ's credibility finding is supported by substantial evidence, and this Court will not disturb it.

**IT IS THEREFORE ORDERED** that the report and recommendation (Dkt. # 26) is **rejected**, and the Commissioner's decision to deny plaintiff's claim for disability benefits is **reversed and remanded**.  A separate judgment is entered herewith.

**DATED** this 26th day of March, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE